# EXHIBIT L

```
            IN THE UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF TENNESSEE
                    NASHVILLE DIVISION


DUANE WHITE, Individually
and as the Surviving
Spouse of CATHERINE WHITE,

        Plaintiff,      Civ. Action No. 3:16-CV
                                         03265
-vs-

STAR S.R.L. - an ICAP GROUP
COMPANY and DEVON INDUSTRIAL
GROUP, LLC,

        Defendants.


_____/


VIDEOTAPED
DEPOSITION OF:     MICHAEL A. TAUBITZ

DATE TAKEN:        Wednesday, February 7, 2018

TIME:              3:09 p.m. to 6:46 p.m.

PLACE:             SEA
                   13930 Lynmar Boulevard
                   Tampa, Florida  33626

REPORTED BY:       Mary Ann Browne, FPR
                   Notary Public


              Regency-Brentano, Inc.
                  Suite 104
              13 Corporate Square
              Atlanta, Georgia 30329
                 (404) 321-3333
```

**Page 6**

1 long as we get an answer to the question that's
2 pending.
3     Okay?
4 A  Okay.
5 Q  Very good. So I understand that you
6 are here as an expert on behalf of Star S.R.L.;
7 is that correct?
8 A  Yes.
9 Q  What is your understanding of your
10 role in this case?
11 A  I was asked to look at the case files
12 and to render an opinion as to the
13 responsibility of Carlex, Star, Mrs. White and
14 other parties as to the cause of Mrs. White's
15 death.
16 Q  Anything else?
17 A  No.
18 Q  Do we all agree that when Catherine
19 White died, there was a safety fence missing
20 that was supposed to be there?
21 A  Yes.
22 Q  And if the safety fence had been
23 there, she would not have been killed, much less
24 injured.
25     Agreed?

**Page 7**

1 A  Not necessarily.
2 Q  You do not agree with that?
3 A  I do not.
4 Q  You believe she could have been killed
5 or injured even if the safety fence was there?
6 A  I believe that had she followed the
7 established procedures for the control of
8 hazardous energy for performing tasks that she
9 would still be alive.
10 Q  Okay. That wasn't my question, sir.
11 And I'll tell you that it's going to go a lot
12 smoother if you will please answer my questions
13 instead of giving a speech on what you'd like to
14 say.
15     Okay?
16     MS. CARPENTER: I'm going to object.
17     MR. SPECKHALS: Please read my
18   question back.
19     MS. CARPENTER: I object to that
20   statement.
21     (Record read back.)
22 A  I answered, not necessarily.
23 BY MR. SPECKHALS:
24 Q  How could she have been killed if the
25 safety fence was there?

**Page 8**

1 A  She would not have been killed had she
2 followed the energy control procedure.
3 Q  That wasn't my question. Again, sir,
4 how could she have been killed if the safety
5 fence had been there?
6 A  If the fence had there been, she would
7 not have been killed.
8 Q  And if the fence had been there, she
9 would not have been injured either, correct?
10 A  Correct. Injury is death.
11 Q  Did the lack of the fence there
12 constitute a manufacturing defect in the machine
13 system?
14     MS. CARPENTER: Object to the form.
15 A  No.
16 BY MR. SPECKHALS:
17 Q  Was it a problem that the fence panel
18 was missing?
19 A  A problem?
20 Q  Yes.
21 A  Yes.
22 Q  And why was that a problem?
23 A  It's a problem because the employer
24 should have assured that the fence was in place.
25 Q  I didn't ask who you believed was

**Page 9**

1 responsible. I'm asking, why was it a problem
2 that the fence wasn't there?
3 A  Because the fence had been designed as
4 part of the overall system, safeguarding system,
5 to prevent someone from going into the cell
6 inadvertently.
7 Q  Where was the machine that we're here
8 about manufactured?
9 A  In Italy.
10 Q  And it was manufactured by Star?
11 A  Yes.
12 Q  Designed by Star?
13 A  Yes.
14 Q  And then it was taken apart and
15 shipped to Tennessee, correct?
16 A  Yes.
17 Q  When it was put together in Tennessee,
18 what do you call that?
19 A  I call that commissioning.
20 Q  And what do you mean by commission?
21 A  Commission is when you have a new
22 machine that upon installation is now wired,
23 debugged and made operational.
24 Q  Was it rebuilt in Tennessee?
25 A  It was rebuilt in the same manner my

**Page 10**

1 understanding as the pre-acceptance runoff in
2 Italy.
3  Q Was it reconstructed in Tennessee?
4  A I would not use that term.
5  Q Was it remanufactured in Tennessee?
6  A No. It was just assembled. I mean,
7 it's a new machine for the Carlex plant. It's
8 been previously tried out and brought over to be
9 made operational at the Carlex facility.
10  Q This -- and I've been calling it the
11 Star machine or the Star system. Do you prefer
12 that we call it something else?
13  A No. That's fine.
14  Q Was it an off the shelf machine or was
15 it a custom machine that Star designed and
16 manufactured?
17  A It looked to be custom.
18  Q Was it also turnkey?
19  A Yes. It would be turnkey.
20  Q Do you agree that the whole reason why
21 we have safety fences is to prevent injuries and
22 death?
23  A That's part of the reason, yes.
24  Q What other reasons are there for
25 having safety fences?

**Page 11**

1  A Well, they're there to prevent
2 inadvertent entry into a hazard area.
3  Q And the reason for that is to prevent
4 injury or death, correct?
5  A Sure.
6  Q Who installed the Star machine at the
7 Carlex plant in Tennessee?
8  A From having read the contracts and
9 looking in their specifications and talking
10 about having a forklift available, I believe it
11 was Devon that actually installed kind of the
12 base machine to get it in location along with
13 the fencing.
14  Q What is your understanding of Star's
15 role in installation?
16  A Again, that's commissioning. Once
17 it's installed, you just have a piece of
18 machinery that's not operational.
19   So Star technicians now had to go in
20 and go through all the programming for all the
21 stops and make sure that the robot system was
22 operational, met quality specs, production,
23 safety, et cetera.
24  Q Was Star involved in the installation
25 of the machine?

**Page 12**

1  A They would have been involved in
2 commissioning.
3  Q But have you -- when you define
4 commissioning, do you include installation or
5 install in the word commission?
6  A No.
7  Q So my question is: Was Star involved
8 in the installation of the machine?
9  A I don't believe so. Again, I looked
10 at the documents. And based upon my own
11 personal past experience doing project
12 management, I believe that it was Devon that
13 would physically install the machine to the
14 given spot and that then Star technicians would
15 takeover to commission and debug.
16  Q Did you read the Star depositions?
17  A Yes.
18  Q Whose depositions did you read from
19 Star?
20  A Gosh, the names -- the Italian names,
21 I read them all. I'm not very good on names.
22  Q Do you remember reading the Star
23 deposition from representative Paolo Marini?
24  A Yes.
25  Q And what do you recall about whether

**Page 13**

1 he said Star was involved in the installation of
2 the machine?
3  A I can't tell you.
4  Q Would you defer to Star's statements
5 as to whether or not they were involved in the
6 installation of the machine?
7   MS. CARPENTER: Object to the form.
8   You can answer.
9  A No.
10 BY MR. SPECKHALS:
11  Q No?
12  A I would not.
13  Q So if Star said they were involved in
14 the installation of the machine, somehow you
15 would disagree with that?
16  A I would from my understanding of how I
17 apply the ANSI standards that are applicable in
18 this case, because there are a lot of terms that
19 are used with overlap. And install, commission,
20 debug are those kinds of terms and there are
21 technical differences.
22  Q Have you ever heard of start-up
23 installation?
24  A I'm sure I have.
25  Q What is start-up installation?

### Page 50

1  who don't remember it, but my question in my own
2  mind is I expect this was properly installed and
3  that for whatever reason, and I have some
4  thoughts on this, for easy access to a printer
5  that malfunctions a lot, that very quickly that
6  things were changed. So that employees coming
7  up and seeing it might have thought that's the
8  way it was from the get-go.
9  Q  You're saying that the fence was moved
10 and changed, that employees that then came upon
11 it would think that's how it always was?
12    A  Yes.
13    Q  And would expect that's how it's
14 supposed to be?
15    A  And accept it particularly for a
16 printer that is giving them a lot of problems
17 with cleaning and maintaining production.
18    Q  In other words, wouldn't think
19 anything is out of the ordinary because it's
20 always been the way that they have seen it?
21    A  From my own experience, we did a
22 workaround. So I have faster access to get in
23 there and get this cotton picker fixed again
24 because I've got to clean the head and I'm
25 holding up production.

### Page 51

1    Q  So getting back to the question of
2  credibility. Do you give more credibility to
3  the testimony of the Star and Devon people that
4  the safety fence was installed properly to begin
5  with than you give to the Carlex people that say
6  the safety fencing was never there?
7        MS. CARPENTER: Object to the form.
8     A  I have tried to answer it, but I
9  would, yes.
10 BY MR. SPECKHALS:
11    Q  There is no evidence that the safety
12 fence was ever moved, though, is there?
13    A  I have not seen that evidence, no.
14    Q  Who had the most expertise on how the
15 Star machine system should have been setup at
16 Carlex?
17    A  When you say "setup," operationally or
18 from a safety perspective?
19    Q  Well, let's break it down this way.
20 Star designed the machine, correct?
21    A  Yes.
22    Q  They manufactured the machine?
23    A  Yes.
24    Q  They had an installation supervisor
25 on-site at Carlex, correct?

### Page 52

1    A  I would call him the commissioning
2  supervisor, yes.
3    Q  Well, is that what the contract called
4  him?
5    A  I'm not sure what the contract called
6  him. Again, I have my terminology that I use is
7  a technical reference back to my ANSI standards
8  to not confuse the difference between install,
9  commission and debug.
10    Q  Take a look at the second page again
11 of Alan Heap's memo and the second paragraph,
12 the top line.
13        Do you see in that first line where he
14 said Star provided an installation supervisor
15 and another support person?
16    A  Uh-huh, I do.
17    Q  Do you disagree with his statement of
18 that?
19    A  I consider that that is the generic
20 term that gets used, that from a technical
21 perspective of how we lay out roles and
22 responsibilities in the applicable ANSI
23 standards that that is really a supervisor to
24 commission that machine.
25        Are some people going to say, yep,

### Page 53

1  that's the installation, they do, but it's not
2  technically correct.
3    Q  Do you agree that Star had more
4  expertise on its machine than anyone else out
5  there?
6    A  Yes.
7    Q  Is anyone able to verify that the
8  safety fence was ever installed in the proper
9  place before Catherine White died?
10        MS. CARPENTER: Object to the form.
11        You can answer.
12    A  Again, my own experience and knowing
13 that within industry is that you're not going to
14 approve payment to Star until that machine has
15 come in and been installed absolutely to design
16 and the as-built drawings.
17 BY MR. SPECKHALS:
18    Q  My question is: Can anyone verify
19 that that's what occurred here?
20    A  That's how I would verify that.
21        MS. CARPENTER: Object to the form.
22        Wait for me to object, please.
23 BY MR. SPECKHALS:
24    Q  You recognize, though, that there have
25 been plenty of times where a company has paid

**Page 70**

1 supervisor. The supervisor went to shut down
2 the line. I'm sorry if I'm missing something.
3     Q   Is it your belief she told the
4 supervisor she was going to go in and the
5 supervisor left knowing that that's what she was
6 going to do?
7     A   It's my understanding that the
8 supervisor said, wait here, I'll go and get the
9 line shut down.
10     Q   Okay. And so if she waited and did
11 not intentionally go into that area, do agree
12 that Lockout/Tagout did not apply?
13     A   I'm trying to understand how she would
14 not intentionally go into the area.
15     Q   Well, let me give you some examples.
16 She slipped, she fell, she lost track of where
17 she was and she accidentally entered the area
18 because there was no safety fence.
19       Do you hold open those are
20 possibilities?
21     A   In looking at the area, I could not
22 begin to see the combination of circumstances
23 where she would have slipped, tripped and fall
24 and gotten her neck into that position.
25     Q   Well, do you know of any reason why

**Page 71**

1 she would have her neck down low in that
2 position if she was intentionally entering that
3 area?
4     A   I don't.
5     Q   And you know from the testimony of the
6 Carlex folks that being down low there would
7 have had nothing to do with the ink jet printer,
8 correct?
9       MS. CARPENTER: Object to the form.
10     A   It's my understanding of -- I don't
11 know what she was doing.
12 BY MR. SPECKHALS:
13     Q   Okay. So if you don't know what she
14 was doing, do you leave open the possibility
15 that she accidentally or inadvertently found
16 herself in the area where she was injured as
17 opposed to intentionally going in there?
18     A   I'm sorry, I don't.
19     Q   And you think that that is absolutely
20 impossible that that was the case?
21       MS. CARPENTER: Object to the form.
22     A   I believe without knowing what she was
23 doing for troubleshooting, service or
24 maintenance that she intentionally went in
25 there.

**Page 72**

1 BY MR. SPECKHALS:
2     Q   But you don't even know when she was
3 there since no one witnessed this whether she
4 was still troubleshooting or doing something
5 actively to look at the problem, correct?
6     A   I used the term troubleshooting
7 because we know we had a problem.
8     Q   But you don't know exactly whether she
9 might have tripped. Even though you don't think
10 that's what happened, it could have, correct?
11       MS. CARPENTER: Object to the form.
12     A   As soon as we knew that we were going
13 to do service and maintenance, you had an
14 affirmative obligation to follow the energy
15 control procedures.
16 BY MR. SPECKHALS:
17     Q   Well, actually in this case, you saw
18 the testimony of Chris Herrmann, the safety guy
19 at Carlex, that there were no established
20 procedures for cleaning the ink jet printer,
21 correct?
22     A   That's correct.
23     Q   And you've written extensively as a
24 matter of fact on the fact that Lockout/Tagout
25 does not apply in certain circumstances such as

**Page 73**

1 routine maintenance and situations that are
2 repeatedly needed to be done, correct?
3     A   Now we're talking the technical
4 aspects of performing minor servicing. And,
5 again, from my observation and brief
6 questioning, Carlex had some excellent energy
7 control procedures for people to enter into
8 those kinds of minor servicing tasks.
9       They don't have to pull a 480 volt
10 disconnect, but they have disabled a machine in
11 a safer manner such that there will not be
12 unexpected energization.
13       MR. SPECKHALS: Can you read the
14    question back.
15       (Record read back.)
16     A   Yes.
17 BY MR. SPECKHALS:
18     Q   And in this case, it was talked about
19 that the ink jet printer had to routinely be
20 serviced, correct?
21     A   Yes.
22     Q   And it was nowhere near the robots
23 which created a hazard or danger, correct?
24       MS. CARPENTER: Object to the form.
25     A   Well, there's hazards and risks other

## Page 74

1 than just the robots.
2 BY MR. SPECKHALS:
3    Q  My question was as to the robots. Do
4 you agree that you could service the ink jet
5 printer without getting anywhere near the danger
6 zone of the robots in this machine system?
7      MS. CARPENTER: Object to the form.
8    A  That's not my understanding, because I
9 could go through any one of the three gates that
10 would now put the operation in safe position to
11 perform minor servicing. So I guess I'm...
12 BY MR. SPECKHALS:
13    Q  Well, yeah, that's a totally different
14 thing, though. There you have the machine shut
15 down when you go through one of those three
16 interlock gates, correct?
17    A  When you say shut down, you still have
18 control energy. You haven't shut the 480
19 disconnect down.
20    Q  There's an interlock device when you
21 go through one of those three gates that shuts
22 the machine down, correct?
23    A  Yes.
24    Q  I'm not talking about that. I'm
25 asking if you agree that you could get up into

## Page 75

1 the area of the ink jet printer without being in
2 the zone of danger where the robots were?
3    A  I would not say that. In fact, I
4 believe Carlex was deficient in not doing a risk
5 assessment when they moved that printer. It
6 should have been done both upon original
7 installation and when it was moved.
8      MR. SPECKHALS: Objection,
9     nonresponsive.
10 BY MR. SPECKHALS:
11    Q  I didn't ask you that question. I'm
12 asking you simply, do you agree that you can get
13 into the area of the ink jet printer and service
14 it without being in the zone of danger of the
15 robots?
16      MS. CARPENTER: He answered that
17     question.
18    A  Zone of danger of the robot, yes.
19 BY MR. SPECKHALS:
20    Q  You are in the zone of danger?
21    A  I agree, that you can get in without
22 being in the zone of danger of the robot.
23    Q  Okay. And you believe that the area
24 where the ink jet printer was and the
25 windshields were coming off the conveyor was a

## Page 76

1 dangerous area, I take it?
2    A  Yes.
3    Q  Given, though, that you have written
4 about being able to service routine maintenance
5 on machines without doing the Lockout/Tagout
6 process, could that have applied here?
7    A  I have written about where you do this
8 where it is not necessary to kill the primary
9 energy source which is called lockout. And that
10 the exception to the control of hazardous energy
11 in OSHA is for minor servicing where you're
12 using control circuitry, which was the Star
13 system and what Carlex. And do I think that's
14 safe? Yes.
15    Q  Also on the -- well, strike that.
16 Have you read or are you familiar with Modern
17 Accident Investigation and Analysis? Have you
18 ever heard of that book? It's written by Ted
19 Ferry.
20    A  My, gosh, back in the '80s, I read it
21 back then.
22    Q  A pretty famous book for engineering?
23    A  Back then.
24    Q  Do you consider it authoritative and
25 reliable?

## Page 77

1    A  It was before the concepts of risk
2 assessment ever took over. Back then it was
3 authoritative, but dramatically outdated today.
4    Q  Well, do you recall that in that book
5 he talked about when you're analyzing and
6 looking at what happened when someone is
7 injured, that the analysis will lead you on a
8 trail seldom of the operator's own conscious
9 choosing?
10     Do you remember words to the effect of
11 that?
12    A  I don't. I'll trust that they are
13 there.
14    Q  Well, I'm paraphrasing, but have you
15 heard and do you recall his writings and
16 studies, that when employees get injured in a
17 situation in a factory, that it's seldom that
18 they intended to get themselves into that
19 situation?
20    A  Oh, I would agree with that.
21    Q  Do you agree that positive guarding of
22 a machine is always preferable to trying to
23 change the operator's or the employee's
24 behavior?
25    A  No, because now it depends upon the

**Page 86**

1 something came through that I would be asked to
2 review for something, I might.
3 Q Have you been asked?
4 A No.
5 Q Have you been provided everything you
6 think you needed to look at?
7 A Yes.
8 Q Is there anything you wish you had or
9 feel you need that you have not been provided?
10 A I can't think of anything, no.
11 Q Go ahead and turn to page 6 of your
12 report, if you would, please.
13 A Okay.
14 Q Take a look at the last paragraph,
15 please.
16 A Yes.
17 Q Do you see where it says, "FDRsafety
18 was asked to review the case from a standpoint
19 of supplier, employer and employee obligations
20 under OSHA?"
21 A Yes.
22 Q When you say supplier, does that mean
23 Star?
24 A Yes.
25 Q As the designer and manufacturer?

**Page 87**

1 A Yes.
2 Q And then whatever startup,
3 installation activities performed, would that be
4 part of supplier?
5 A Commissioning is part of that, yes.
6 Q And then, of course, employer would be
7 Carlex?
8 A Yes.
9 Q What would Devon be considered, Devon
10 Industrial? Would that be a supplier?
11 A They would be another supplier to
12 Carlex.
13 Q And when you said you were asked to
14 review the case from a standpoint of obligations
15 under OSHA, why were you asked, if you know, to
16 review it based upon standards under OSHA?
17 A Because OSHA is the law of this land.
18 It is what sets safety for employers and
19 employees. It's the OSH Act.
20 Q But it doesn't have anything to do
21 with the requirements of safety, design,
22 manufacture, installation on companies like Star
23 and Devon Industrial, correct?
24 A That's correct.
25 Q And you went on to say, "Specifically,

**Page 88**

1 FDR was asked to determine whether Mrs. White,
2 Carlex, Star or Devon had responsibility for
3 Mrs. White's death."
4  Do you see that?
5 A Yes.
6 Q In your opinion, did Mrs. White have
7 any responsibility for her death?
8 A Yes.
9 Q Did Carlex have any responsibility for
10 her death?
11 A Yes.
12 Q Did Star have any responsibility?
13 A I can't find it, no.
14 Q Did Devon?
15 A No.
16 Q So you're blaming Catherine White and
17 her employer for Catherine White's death?
18 A I'm not blaming them. I'm assigning
19 the legal responsibility where it belongs.
20 Q You don't think that's blame?
21 A I don't think that's blame.
22 Q How is blame different than what you
23 just said?
24 A Blame is pointing a finger at someone
25 factually finding what happens in a case. And

**Page 89**

1 in this case, when Carlex buys a piece of
2 equipment, they now, and Mr. Herrmann was very
3 good in his deposition a couple of times to say,
4 it was Carlex's responsibility.
5  They assumed the full legal
6 responsibility of that which they buy in for the
7 safe operation with their employees.
8 Q If Star and Devon put together or
9 install a dangerous or defective machine at
10 Carlex, is it your opinion that they are not
11 responsible for that?
12 A If Carlex buys off on that for
13 whatever they choose, why they would, I would
14 have no idea, but that is their legal
15 responsibility and that transition of risk and
16 hazard control goes to the user.
17 Q So you believe once Carlex buys off on
18 the machine that Carlex -- strike that. You
19 believe that once Carlex buys off on the
20 machine, that Star and Devon are relieved of any
21 responsibility?
22  MS. CARPENTER: Object to the form.
23 A I do.
24 BY MR. SPECKHALS:
25 Q I'm sorry?

## Page 94

1 section is on ANSI B11.0 - 2015, correct?
2 　A　Correct.
3 　Q　When did ANSI B11.0 - 2015 take
4 effect?
5 　A　In 2010.
6 　Q　Are you sure about that?
7 　A　Yes. Before that, we had ANSI B11.0
8 was a general standards requirement that
9 transitioned to B11.0 in 2010. It was updated
10 in 2015 and it's being updated as we speak.
11 　　　MR. SPECKHALS: Let's go ahead and
12 　mark this as Exhibit 24.
13 　　　(Exhibit 24 marked for
14 　identification.)
15 BY MR. SPECKHALS:
16 　Q　I'm going to hand you what we've
17 marked as Exhibit 24. And do you recognize that
18 as some excerpts and pages from ANSI B11.0 -
19 2015?
20 　A　Yes.
21 　Q　And, in fact, I pulled the sections
22 that you cited in your report. Flip through and
23 see if you agree.
24 　A　Yes. This is part of the overall
25 standard.

## Page 95

1 　Q　What I'm saying is, you agree I pulled
2 the sections that correspond to the sections you
3 cited in your report?
4 　A　Yes. It would appear to be that way,
5 yes.
6 　Q　Take a look at the first page of
7 Exhibit 24, ANSI B11.0 - 2015 for me.
8 　A　Okay.
9 　Q　When was it approved?
10 　A　25 of August of 2015.
11 　Q　Hence, the 2015 in the name of the
12 standard, correct?
13 　A　But this just updated the 2010
14 standard.
15 　Q　It's a different standard, correct?
16 　A　No. It's an update.
17 　Q　I can mark, and I guess we'll do that.
18 Do you agree that ANSI B11.0 - 2010 has
19 different language and says different things
20 than ANSI B11.0 - 2015?
21 　A　I'm sorry, I got lost on that.
22 　Q　Is ANSI B11.0 - 2010 different than
23 ANSI B11.0 - 2015?
24 　A　Yes.
25 　Q　Okay. And ANSI B11.0 - 2015, since it

## Page 96

1 wasn't approved until August 25th of 2015, it
2 would not have even applied at the time the Star
3 machine was manufactured and installed at Carlex
4 in April and/or May of 2012, correct?
5 　A　No. It would been -- right. It would
6 have been in play at the time of the accident.
7 　Q　As far as it applying to suppliers, as
8 a supplier, Star and Devon were no longer out at
9 Carlex in Tennessee in 2015, correct?
10 　A　Correct.
11 　Q　They were out there in 2012?
12 　A　Yes.
13 　Q　So the ANSI B11.0 dash whatever
14 standard that would apply to them would have
15 been the 2010 version, correct?
16 　A　Correct.
17 　Q　Why did you not use the ANSI B11.0 -
18 2010 since that is what would have applied to
19 Star and Devon?
20 　　　MS. CARPENTER: Object to the form.
21 　Go ahead.
22 　A　And, again, I did that because of the
23 most recent standard that was in play at the
24 time of the accident.
25 　　　If I were to go back and look at the

## Page 97

1 vast majority of all of these figures and other
2 things from 2010, they're essentially the same.
3 Some of the language may have changed, but not
4 substantially.
5 　　　The updates are just to -- each ANSI
6 standard must be reaffirmed or updated each five
7 years or it loses its status as a U.S. national
8 standard.
9 　Q　Can Devon and Star be held responsible
10 for the machine we're here about based upon the
11 ANSI B11.0 - 2015 standard?
12 　A　No.
13 　Q　That's because it didn't apply to them
14 when they were doing their work, correct?
15 　A　Right. It would have been the 2010
16 version, you're correct.
17 　Q　Yet, you did not analyze extensively
18 in your report the 2010 version like you did the
19 2015 version, correct?
20 　A　I didn't go back to take those direct
21 comparatives. And in retrospect, that's a very
22 good point that you bring up. Again, I used the
23 most recent one because of the time of the
24 accident.
25 　　　I do know from my own knowledge, I'm

```
 1  on this committee, that all of the basics that
 2  are in here for supplier and user and
 3  responsibilities are essentially the same.
 4     Q   But if you're using a version that did
 5  not even apply to Star and Devon, do you agree
 6  that it would be difficult if not impossible to
 7  find that they had responsibility or fault since
 8  you're using a standard that didn't even apply
 9  to them?
10         MS. CARPENTER: Object to the form.
11     A   Again, counselor, I agree with you.
12  My knowledge, I can tell you that the bases of
13  these things, you'll find these same pictures
14  and diagrams and probably 98 percent of the
15  words from 2010 the same as 2015.
16         And I did use the most recent standard
17  because of the date of the accident, but you're
18  also correct, it would have been 2010 that would
19  apply to Star and Devon.
20  BY MR. SPECKHALS:
21     Q   There were some changes that were
22  significant, though, between the 2010 and the
23  2015 version; were there not?
24         MS. CARPENTER: Object to the form.
25     A   Well, I would have to go back and
                                           Page 98
```

```
 1  review. I can't tell you right off the top of
 2  my head. The basics of roles, responsibilities,
 3  I don't remember any major changes made in these
 4  areas.
 5         VIDEOGRAPHER: We're off the record.
 6  The time is 5:02 p.m. We are back on the
 7  record. The time is 5:02 p.m.
 8         (Exhibit 25 marked for
 9  identification.)
10  BY MR. SPECKHALS:
11     Q   I'm going to hand you what we have
12  marked as Exhibit 25. Do you recognize that as
13  the similar sections covering similar topics?
14     A   Yes.
15     Q   From your report with the ANSI B11.0 -
16  2010?
17     A   I do.
18     Q   Did you make a conscious decision to
19  use the 2015 standard in your report?
20     A   Yes.
21     Q   And you said the reason for that was
22  because that would have been the one in effect
23  when Catherine White died on January 22, 2016?
24     A   Yes.
25     Q   If that's the case then, turn to page
                                           Page 99
```

```
 1  10, please.
 2     A   Of 2010?
 3     Q   Of your report, I'm sorry. Turn to
 4  page 10 of your report, which we marked as
 5  Exhibit 23 for those following along.
 6     A   Okay.
 7     Q   You copied a chart out of the ANSI
 8  B11.0 standard, correct?
 9     A   Yes.
10     Q   Why is it, though, that you copied the
11  2010 version into your report rather than the
12  2015?
13     A   I think here because, and I'm just
14  going to go back, that I did recognize the
15  supplier and user relationship in place at the
16  time.
17         I think we'll find no change to 2015,
18  but consciously, I was trying to use that
19  diagram that to me gets at the meat of supplier
20  and user relationships for Carlex and Devon.
21     Q   Well, actually, there was a
22  substantial change in the diagram between 2010
23  and 2015.
24         Take a look at page 25 of Exhibit 25,
25  which is the 2010 version and now take a look at
                                          Page 100
```

```
 1  page 17 of Exhibit 24, which is the 2015
 2  version.
 3     A   Okay.
 4     Q   Do you agree that the pictures or
 5  diagrams -- strike that. Do you agree that the
 6  figure is different, the diagram is different?
 7     A   Yes.
 8     Q   And, in fact, in the 2015 version,
 9  which you did not use in your report despite
10  using 2015 for everything else, it shows that
11  the supplier has responsibility for the
12  installation and the debugging of the machine,
13  correct?
14     A   When part of purchase agreement, yes.
15     Q   Yet, the version that you went back to
16  for this and only this section of your report,
17  the 2010 version, has the installation and
18  debugging only being the responsibility of the
19  user, correct?
20     A   Correct.
21     Q   Was that a conscious decision that you
22  made there?
23     A   Yes.
24     Q   So if you had used the 2015 version
25  for your diagram, it would have provided that
                                          Page 101
```

## Page 106

1　A　Based upon what we know of the fence
2　not being in proper position, that should have
3　been picked up at both the original installation
4　of the printer and the movement of it.
5　　　MR. SPECKHALS: Objection,
6　　nonresponsive.
7　BY MR. SPECKHALS:
8　Q　I'm just asking you. When they moved
9　the printer, was there any need to move the
10　fence?
11　A　I would have said yes.
12　Q　What's the evidence and testimony?
13　Was there any movement of any fence when they
14　moved the printer?
15　A　No.
16　Q　So the printer could be moved without
17　the need for moving the fence, correct?
18　A　That's the problem. They --
19　Q　I'm asking you, yes or no. Physically
20　could the printer be moved without moving the
21　fence?
22　A　Yes.
23　Q　And physically the printer was moved
24　without moving the fence?
25　A　Yes.

## Page 107

1　Q　In your report at the bottom of page
2　9, you make the statement that ANSI clearly
3　identifies Carlex as having primary
4　responsibility to install and debug the
5　machinery and equipment in preparation for
6　production.
7　　　Do you see that?
8　A　U-huh, yes.
9　　　MS. CARPENTER: Well, it says
10　　commission in parenthesis.
11　BY MR. SPECKHALS:
12　Q　Does that change my question to you?
13　　　MS. CARPENTER: I want it to -- if
14　　you're reading, I want you to read it
15　　accurately for the record.
16　　　MR. SPECKHALS: Go ahead, Brigid. Do
17　　you want to read it? I'm asking him a
18　　generic question.
19　BY MR. SPECKHALS:
20　Q　Does it say that or does it not say
21　that? Do you think I read it inaccurately that
22　it changes your answer?
23　A　I've kind of lost what now was asked.
24　Q　I'll read it exactly to comply with
25　what Brigid would like and I'm going to ask you

## Page 108

1　a question about this.
2　　　Okay?
3　A　Okay.
4　Q　You wrote, "ANSI B11.0 clearly
5　identifies the user, Carlex, as having primary
6　responsibility to install and debug,
7　parenthesis, commission, end parenthesis,
8　machinery and equipment in preparation for
9　production operation."
10　　　Do you see that?
11　A　Yes.
12　Q　Did I read that correctly?
13　A　Yes.
14　Q　Where in ANSI does it identify Carlex
15　as having primary responsibility for that
16　installation and debugging?
17　A　When you turn the page and you look at
18　the diagram, Carlex is the user.
19　Q　And that's because you're saying that
20　the picture shows installation and debugging
21　under the user which is Carlex?
22　A　Yes.
23　Q　But if you had used the updated 2015
24　version which you used through the rest of your
25　report, it shows that installation and debugging

## Page 109

1　is also Star's responsibility, correct?
2　A　Correct.
3　Q　And as far as this picture or diagram,
4　which is actually listed as a figure in the
5　standards, is it, for lack of a better word, the
6　Bible? Is it unchangeable, you have to look at
7　everything exactly how this picture is?
8　A　No. It's a guideline for roles and
9　responsibilities on how things work.
10　Q　And, in fact, when you look at that
11　drawing, the ANSI standards specifically
12　recognize that it's just that, a guideline.
13　　　In other words, it is not something
14　that is in stone that must be done as far as
15　responsibilities exactly as it's written,
16　correct?
17　A　It is a U.S. national standard that is
18　voluntary for suppliers and users to use.
19　Q　Well, flip to Exhibit 24, the ANSI
20　B11.0 - 2015.
21　A　Okay.
22　Q　And flip to pages 16 and 17.
23　A　Yes.
24　Q　And you recognize the diagram that you
25　copied and pasted into page 10 of your report,

**Page 118**

1 responsibility?
2     MS. CARPENTER: Object to the form.
3   Go ahead.
4   A  If I were to redo my words with that
5 kind of thinking, but, again, this is a mix of
6 my background, experience, knowing who is
7 legally responsible of coming in.
8     And the fact that this particular
9 figure in play at time shows that
10 responsibility. And I will stand corrected if
11 there is a better choice of words.
12 BY MR. SPECKHALS:
13   Q  Okay, but when you keep saying legal
14 responsibility, you understand you're not here
15 to give legal responsibility opinions, you're
16 here to give engineering standards opinions,
17 right?
18     MS. CARPENTER: Object to the form.
19   A  I'm here to assist people in knowing
20 whether or not they would be ultimately in
21 compliance with OSHA from a technical
22 standpoint.
23 BY MR. SPECKHALS:
24   Q  Okay, but Star and Devon are never
25 going to be out of compliance with OSHA in this

**Page 119**

1 case since it doesn't apply to them, right?
2   A  Yes, correct.
3   Q  Let's take a look at the 2010 standard
4 a little bit more, which you do agree applies to
5 Star and Devon, correct?
6   A  Yes.
7   Q  As suppliers?
8   A  Yes.
9   Q  Do you see on page 24 of ANSI B11.0 -
10 2010 where at the bottom it says in turnkey
11 situations, the interaction can be extensive?
12   A  Yes.
13   Q  And it's talking about the interaction
14 between the supplier and user, correct?
15   A  Yes.
16   Q  And that interaction can involve the
17 installation, the debugging, the installation,
18 the safeguarding, all of those things, correct?
19   A  Yes.
20   Q  And it's referring to the fact that
21 when you have a customer turnkey project like we
22 had in this case, the supplier, meaning Star, is
23 going to be much more involved than the
24 comparison they make where you just buy a
25 machine off the shelf and have no involvement

**Page 120**

1 with the supplier, right?
2   A  Correct.
3   Q  Would you agree that based upon the
4 testimony in this case that indeed Star and
5 Devon did have a lot of interaction and
6 collaboration with Carlex?
7   A  Yes.
8   Q  In getting this machine reconstructed
9 or setup, installed at the plant?
10   A  Yes.
11   Q  When the machine, the Star machine was
12 put into the Carlex plant, would that be
13 considered constructing the machine there?
14     MS. CARPENTER: Object to the form.
15   A  No. I would consider that installing
16 and commission.
17 BY MR. SPECKHALS:
18   Q  What's construction? It usually means
19 to build something, right?
20   A  Yeah.
21   Q  Were they building the machine on-site
22 at the Carlex plant?
23   A  I think of construction when
24 oftentimes I have several pieces of equipment
25 possibly even from different suppliers coming

**Page 121**

1 together for integration.
2     Again, these are terms that are not
3 easily defined because there's so much variable
4 in the way they are used in the industry.
5   Q  So could someone interpret what was
6 going on at Carlex as constructing the machine?
7     MS. CARPENTER: Object to the form.
8   A  I guess.
9 BY MR. SPECKHALS:
10   Q  And then take a look at page 26 of the
11 ANSI B11.0 - 2010 standard. Take a look
12 particularly at paragraph 4.4.
13     Do you see that?
14   A  Yes.
15   Q  Do you see where it says, "The
16 supplier shall use the risk assessment process
17 in designing and constructing the machine?"
18     Do you see that?
19   A  Yes, I do.
20   Q  And then it goes on and says, "And for
21 developing the information for operation and
22 maintenance of the machinery considering the
23 lifecycle of the machine," correct?
24   A  Yes.
25   Q  So, obviously, the lifecycle means how

**Page 122**

1 long this machine is going to be usable before
2 it has to be decommissioned and taken apart and
3 no longer used, right?
4    A    Yes.
5    Q    The information for operation and
6 maintenance of the machinery, that has to do
7 with the operations and maintenance manual,
8 correct?
9    A    Correct.
10    Q    The designing of the machine is
11 self-explanatory. That's when you design what
12 the machine is going to be, correct?
13    A    Yes.
14    Q    And then it says in constructing the
15 machine. Constructing the machine, meaning
16 putting it together, correct?
17    A    Yes.
18    Q    When the supplier, in this case Star
19 and Devon are putting together the machine, are
20 they supposed to do a risk assessment in writing
21 or is that something that can just be done
22 without recording it?
23    A    That's already been done by Star.
24    Q    And what about 4.5, paragraph, 4.5,
25 installation, commissioning and start-up?

**Page 123**

1 That's where it says, "The user and supplier
2 shall ensure that the risks associated with the
3 installation, commissioning and start-up of the
4 machinery are reduced to an acceptable level,"
5 correct?
6    A    Yes.
7    Q    And that means when they say user and
8 supplier, that means a collaborative effort,
9 right?
10    A    Yes.
11    Q    Meaning that Star is supposed to be
12 involved in that too?
13    A    Sure. Star has to have appropriate
14 procedures in place for the protection of their
15 own technicians, because, in fact, they are
16 working on the machines before the final design
17 safeguards are fully in place.
18    Q    But you saw the testimony of Star that
19 they were there to start-up the machine,
20 correct?
21    A    Yes.
22    Q    To start it up for -- the start-up
23 installation so it then could be used to put
24 into production for windshields?
25    A    Correct. When you're done with

**Page 124**

1 commissioning and debugging, you're there to
2 start-up the machine for production.
3    Q    And was that proper and appropriate
4 for Star to be involved in the installation,
5 debugging and start-up like that?
6    A    Yes.
7    Q    And did they have responsibility to do
8 their work competently and properly?
9    A    Yes.
10    Q    And you saw their testimony, that as
11 part of that, they were supposed to check all
12 safety systems on the machine and production
13 line, correct?
14    A    Yes.
15    Q    And make sure that everything was done
16 properly?
17    A    Yes.
18    Q    And if they failed to do that, they
19 would have failed in meeting their
20 responsibilities, they being Star, correct?
21        MS. CARPENTER: Object to the form.
22    A    Yes, if they failed.
23 BY MR. SPECKHALS:
24    Q    Then in 4.6, if you look down a little
25 bit further, do you see under safeguarding, it

**Page 125**

1 says, "The supplier shall provide safeguarding
2 as determined in the supplier risk assessment
3 and the appropriate machine-specific standard?"
4    A    Yes.
5    Q    So that means that Star needed to
6 provide the safeguarding, in this case, safety
7 fencing, right?
8    A    And interlocks and the disconnects and
9 the full gamut, yes.
10    Q    And if they failed to do that, they
11 would have violated what they should have done,
12 correct?
13    A    Yes.
14    Q    It talks about on the next page, 4.8,
15 training of user personnel.
16    A    Yes.
17    Q    In this case, did you see that Star
18 provided training to the Carlex people?
19    A    You mean formal type training?
20    Q    Exactly.
21    A    I didn't see that, no. That's not
22 part of industry practice.
23    Q    So when you've been talking about your
24 knowledge of how things are typically done, if
25 Star provided the training, that would not be in

REGENCY-BRENTANO, INC.
32 (Pages 122 to 125)